NAOMI CHUNG (CSBN 283743)
Hickey & Chung, LLP
Pier 9, Suite 100
San Francisco, CA  94111
Telephone:  (415) 942-9000
Facsimile:  (415) 484-7054
chung@defender.law

Attorney for Defendant
JAIRO NOEL RODRIGUEZ-MARTINEZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAIRO NOEL RODRIGUEZ-MARTINEZ<br><br>Defendant. | Case No. CR 19-00707-HSG-1<br><br>**DEFENDANT JAIRO NOEL RODRIGUEZ-MARTINEZ'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br><br>Sentencing Date: October 19, 2020<br>Time: 2:15 p.m. |

## I.        INTRODUCTION

Defendant Jairo Noel Rodriguez-Martinez respectfully submits this Sentencing Memorandum and Motion for Downward Variance.  Mr. Rodriguez-Martinez was arrested on December 9, 2019 and has been detained for about 10 months at Santa Rita Jail on charges of distributing drugs.  During his incarceration, he has been quarantined three times for possible COVID-19 exposure and then, unfortunately, for a COVID-19 infection.  An appropriate sentence in this case is time served (10 months).

The mental stress from repeated quarantines during the pandemic and his physical affliction with a life-threatening disease makes this requested sentence of time served significantly longer than the actual time of 10 months.  The grim reality is Mr. Rodriguez-Martinez has already served a significantly greater sentence and faces uncertain future health consequences caused by his

incarceration at Santa Rita Jail.  He has a wife, three young children ages 4, 7, and 14, and elderly parents in Honduras, all depending on his support when he is eventually deported to his home country.  He has helped support his family since the age of 11 but is now anxious wondering if his incarceration at Santa Rita Jail will eventually rob him of his ability to meet those responsibilities due to his compromised health.  This unfortunate reality of the pandemic and other sentencing factors under § 3553(a) support the request for a sentence of time served.

## II.   INDIVIDUAL BEFORE THE COURT

### a.  Family Background

Jairo Noel Rodriguez-Martinez was born into extreme poverty in a rural town in Honduras.  PSR ¶ 39.  His parents, Jose Martinez and Glenda Rodriguez, worked tirelessly in the fields as farmers to provide for Jairo and his two, younger sibling – Wilson and Eris.  Despite their hard work, the parents struggled to provide for a family of five with a combined daily wage of at most 80 pesos which is about $3.79.[1]  There were periods of time where both parents were unable to find work and the family had to go days without food.  PSR ¶ 40.  As the oldest of the three children, Jairo often had to make sacrifices for his younger brothers who were less tolerant of their hunger pains.  The town also had no direct access to electricity or running water.  PSR ¶ 40.  By the time Jairo was 6 or 7 years old, he and his younger brother Wilson were responsible for walking to the river a few miles away from home to fill up buckets with water to bring back for the family.  PSR ¶ 40.

Education was a luxury Jairo's parents could not afford.  At age 11, he was forced to quit school because his parents could no longer afford it and they needed him to start working to help support the family.  Since Jairo was too young to join his parents in the fields, he found random jobs around town to help put food on the table while caring for his younger brothers.

When Jairo turned 15 or 16 years old, he met a boy from his neighborhood that had recently returned from the United States with enough money to buy gifts for his family including a car, fancy food, and better clothes.  Jairo was mesmerized by the boy's stories of opportunities in America that

---

[1] Currency converted through https://www.google.com/search?q=pesos+to+UD&oq=pesos+to+UD&aqs=chrome..69i57j0l7.8663j1 j7&sourceid=chrome&ie=UTF-8.

2

1    were just waiting to be seized by those who were brave and strong.  For Jairo, the stories of America

2    were a small but bright glimmer of hope that he too may be brave and strong enough to secure a

3    better future for his family.

4         Jairo's parents disapproved of him leaving home at such a young age to fend for himself in a

5    foreign country, but for Jairo it was the only choice for a better life.  So, at age 16, with only a small

6    backpack, he moved to Denver, Colorado.  PSR ¶ 41.  However, the better opportunities the local boy

7    had connected him to was not exactly Jairo had dreamed about; his reality was very different.  He

8    began working as a lackey to a drug trafficking operation and eventually worked his way up to being

9    a street-level drug dealer.  Without any parental supervision and having left Honduras at a vulnerable

10   and impressionable age, Jairo began using marijuana and cocaine which led to misdemeanor

11   convictions for trespassing, providing false information to authorities, and shoplifting.  PSR ¶¶ 52,

12   26-28.  Despite his drug habit, Jairo always managed to put his family first and consistently sent

13   home most of the money he was able to save.

14        Within a few years, his younger brother, Wilson, joined him in Denver, Colorado because their

15   mother could no longer work due to her health, and the family needed extra money to pay for her

16   monthly diabetes and hypertension medication.  To this day, Jairo's biggest regret is not sending his

17   younger brother straight back home.  Instead, he let Wilson stay with him and get involved in the

18   drug business.  Wilson was arrested within the year and thereafter sentenced to serve five years in

19   prison.  While his brother was in custody, Jairo's drug use spiraled out of control and in 2016 he was

20   also arrested for possession of dangerous drugs.  PSR ¶ 32.  Jairo was in custody for about six months

21   before he was deported.

22        When Wilson served his prison sentence and returned home to Honduras, he was a shell of the

23   brother that Jairo once knew.  Wilson seemed unusually tense and nervous all the time; he never

24   smiled and barely spoke.  He noticed that his brother seemed to be in a daze most of the time, almost

25   as if he were in his own world.  Jairo questioned his brother about what was going on and learned that

26   Wilson had been in the "hole", i.e. solitary confinement, for nearly a year while serving his five-year

27   prison sentence because he had gotten involved in a fight with other inmates at the prison.  Jairo

28   recalls Wilson telling him that sometimes he felt like he was still in the "hole" even though he knew

1   he was back at home.

2      A few weeks later, on a Monday morning, Jairo went to wake Wilson up so that they could

3   finishing digging out a new pit toilet but was horrified to find his younger brother had committed

4   suicide.  Wilson had wrapped a blanket around the gun so that his family would not hear the gunshot

5   in the middle of the night.  PSR ¶ 44.

6      Wilson's suicide tore a hole in Jairo's heart that has not healed to this day.  He says it was the

7   "worst thing that has ever happened in my life."  PSR ¶ 44.  Jairo did not know how to go on without

8   having his brother in his life – the two were inseparable from a young age and were the best of

9   friends.  He was angry and confused as to how a prison in America could psychologically torture a

10  man to the point that he loses the will to live, even upon his release.  But Jairo placed most of the

11  blame on himself because he was the one that had failed to protect his younger brother.  Even to this

12  day, he cannot talk about Wilson without breaking down into tears.  Jairo has two tattoos on his left

13  arm – "RIP" and "Wilson" so that his brother will always be with him.

14         **b.  The Offense**

15      After his brother's death, Jairo vowed never to return to the United States, but tragedy struck

16  the family again.  Jairo's father was involved in a serious motorcycle accident and suffered severe

17  injuries to his spine which left him paralyzed from the waist down.[2]  It was clear that his father would

18  not only need surgery, but possibly multiple surgeries, as well as continued treatment with

19  medication and rehab.  Moreover, the hospitals refused to treat his father without paying for the

20  medical costs upfront.  Jairo was desperate.

21      In light of Wilson's death and both his parents unable to work, Jairo needed to find a way to

22  make enough money to provide and care for his entire family.  Unfortunately, no matter how hard he

23  was willing to work, he could not get a job in Honduras that would allow him to provide for his two

24  kids, pay for his mother's monthly medication and cover all his father's hospital expenses.  Jairo

25  reached out to a cousin in Florida who thought he could get him a job in construction which required

26  Jairo to return to the United States.

27

28

---

[2] *See* Exhibit 1 – Letter from Father's Physician.

Jairo did not want to break his promise to never return to the United States after what happened to his brother, but he was desperate to save his family. He sought the assistance of a "coyote"[3] and walked about eleven days towards the Mexico-Arizona border while being forced to carry an oversized pack on his back. At the border, Jairo was unable to pay the coyote's entire fee and was taken to an unknown location for about a month as hostage until the fee could be fully paid. He was confined in a room with no windows in what appeared to be a basement. He had no bed and only a small lamp. He was only given enough food and water to stay alive. PSR ¶ 46. The coyotes were armed and regularly threatened to kill him. He was beaten on two occasions when a relative he called to ask for money did not pick up the phone. He still cannot forget the cries of other hostages being beaten alive on the other side of the walls.

The coyotes refused to let Jairo go to Florida even though he explained to them that he could pay them their fee once he started his construction job. Instead, they agreed to release him so that he could work off his debt to them by selling drugs. They warned Jairo that if he tried to run or play games, they would find his family and kill them.

Jairo agreed to their terms and within a month he was working for them distributing drugs in the Bay Area. He sent home as much money as he could so that they could start saving up to pay for his father's surgery. His father received his first surgery in 2018, and more recently on August 6, 2019 he underwent emergency surgery which cost approximately $12,100.[4] His father was in recovery and receiving rehabilitation therapy up until Jairo's arrest. Since Jairo has been in custody at Santa Rita Jail the family has been unable to pay for the father's rehabilitation therapy.[5]

The DEA began investigating Jairo in September of 2019 which led to his arrest on December 9, 2019. He was charged with a three-count Indictment in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). PSR ¶ 1.

Shortly thereafter, the COVID-19 pandemic hit the United States.[6] The Bureau of Prisons'

---

[3] "Coyotes" is the name for smugglers who facilitate the illegal migration of people across Mexico-United States border.
[4] *See* Exhibit 1 – Letter from Father's Physician.
[5] *Id*.
[6] *See* Centers for Disease Control and Prevention, *Evidence for Limited Early Spread of COVID-19 Within the United States, January-February 2020*,

1    (BOP) was unable to stop the virus from spreading within its jails and prisons, which raised serious

2    concern as to any facility's ability to ensure the health and safety of its inmates.  Jairo has spent the

3    last 10 months at Santa Rita Jail where he has been placed under quarantine on three separate

4    occasions due to COVID-19.

5         After Jairo was quarantined for the second time, on May 13, 2020, defense counsel made an

6    oral motion for Jairo's Temporary Release on the basis that he is at high risk for severe illness and

7    permanent harm if infected with COVID-19 due to his arterial hypertension and his family's history

8    of cardiac complications. [7]  Dkt. No. 23-25.  His motion for temporary release was denied on May 21,

9    2020.  Dkt No. 27.  Fifty-Five days later, Jairo tested positive for COVID-19 and was symptomatic.[8]

10        Jairo has served a total of 315 days as of the date of this sentencing hearing.  During his time in

11   jail he was quarantined three different times because of the COVID-19 pandemic for a total of 31

12   days.[9]  He tested positive for COVID-19 on July 15, 2020 and is now worried that his immune

13   system has been compromised rendering him even more vulnerable to severe illness if he's infected

14   again.

15   **III.    SENTENCING GUIDELINES CALCULATION**

16        The parties agreed in a plea agreement to a Sentencing Guidelines calculation resulting in a

17   Total Offense Level of 25, which is consistent with the calculations in the PSR.  The parties agree

18   that Mr. Rodriguez-Martinez is a Criminal History Category I.  The advisory Guidelines range is 57

19   to 71 months.

20   **IV.    CORRECTIONS TO THE PSR**

21        Mr. Rodriguez-Martinez requests that the following facts in the PSR be corrected:

22        ▪ His date of birth is June 19, 1985.  PSR ¶ 38.

23        ▪ His father's age is 56 and his mother's age is 57.  PSR ¶ 38

24        ▪ His brother's name is spelled "Eris Adonis Martinez" and he is Mr. Rodriguez-Martinez's

25            paternal brother.  PSR ¶ 38.

26   _____

27   https://www.cdc.gov/mmwr/volumes/69/wr/mm6922e1.htm.
     [7] Exhibit 2 – Letter from Physician in Honduras.

28   [8] Exhibit 6 – Medical Records Showing COVID-19 Positive & Symptoms.
     [9] *See* Exhibit 5 – Quarantine Medical Records.

1

- He relocated to the Bay Area at the end of 2017 or early 2018.  PSR ¶ 41.

2

- He was taken prisoner for nearly one month in an unknown location with barely any food,

3

    water, and light.  The reference to 1-2 weeks was in regard to how long it took him to walk

4

    to the border while carrying an oversized pack on his back.  PSR ¶ 46.

5

- His mother sent him prescribed medication from Honduras, but only could buy enough for

6

    herself and Mr. Rodriguez-Martinez.  PSR ¶ 48.

7

**V.    THE MOTION FOR DOWNWARD VARIANCE SHOULD BE GRANTED AND MR.**

8

**RODRIGUEZ-MARTINEZ SENTENCED TO TIME SERVED.**

9

This is a case where the application of the § 3553(a) factors show that the advisory guidelines

10

sentence is very far afield from Congress' directive to " 'impose a sentence sufficient, but not greater

11

than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85,

12

101 (2007) (quoting 18 U.S.C. § 3553(a)).  Consideration of the advisory guidelines range is

13

subordinate to the mandate that the punishment be a particularized sentence *minimally sufficient* to

14

accomplish the statutory purposes of sentencing.  *See United States v. Carty*, 520 F.3d 987, 995 (9th

15

Cir. 2008) (en banc) (emphasis added).  Here, the application of the § 3553(a) factors supports a

16

sentence of time served (10 months) for Mr. Rodriguez-Martinez.

17

**a.  Mr. Rodriguez-Martinez's History and Characteristics**

18

Mr. Rodriguez-Martinez recognizes the seriousness of his crime and is deeply remorseful.

19

Still, his criminal conduct must be considered in the context of his entire life, starting as a boy

20

growing up in poverty to losing his younger brother to suicide.  Jairo's early drug use and relentless

21

efforts to support his family is the expected result of a child growing up in extreme poverty.  A large

22

and growing body of research shows that childhood poverty can cause significant psychological

23

damage in adulthood due to the stress children are exposed to at a young age.[10]  The stress of not

24

knowing when your next meal will be can have toxic consequences on a child's brain development

25

and mental and physical health.[11]  Indeed, Mr. Rodriguez-Martinez felt this stress at a young age

26

27

[10] Gary Evans, *Childhood Poverty and Adult Psychological Well-Being*, Cornell University, Proceedings of the National Academy of Sciences, (2016), https://www.pnas.org/content/113/52/14949.

28

[11] Clancy Blair and C. Cybele Raver, *Poverty, Stress, and Brain Development: New Directions for Prevention and Intervention*, (January 12, 2018)

watching his parents struggle to provide for him and his brothers.  His actions in this case were not out of greed or wanting a life of luxury, it was survival—he needed money to put food on the table, keep his brothers and children in school, and pay for his mother's medication and his father's surgeries and rehabilitation therapy.

Rather than seeking professional help for the trauma and pressure he experienced at a young age, Mr. Rodriguez-Martinez suppressed these emotions in order to be strong for his younger brothers and his parents.  These emotions, however, were exacerbated by his brother's suicide.  Studies show that survivors of suicide loss are at higher risk of developing major depression, post-traumatic stress disorder, and suicidal behaviors, as well as prolonged grief.[12]  To this day, Mr. Rodriguez-Martinez struggles to make sense of why his brother made the decision to end his life and is haunted by the images of finding his brother's lifeless body.  He was never given adequate time to process this grief before he had to sacrifice his life once again for his family's well-being.  Mr. Rodriguez-Martinez knows the effect his incarceration has had on his parents after having lost one son to the trauma of prison, and says:

> I will never forgive myself if my parents die while I am in prison.  And I am trying to stay strong and healthy in prison because I don't think my parents will survive another death of their child and I know I need to get back to them so that I can take care of them.[13]

Even at a young age, Mr. Rodriguez-Martinez always had a resilient drive to support his family and loved ones no matter the cost.  He was forced to become one of the breadwinners for the family at the age of 11 years old, holding only a sixth-grade education.  His cousin, Kelin Gloribel Hernandez Rodriguez, describes Mr. Rodriguez-Martinez as:

> [A] person with a noble heart who sacrifices himself for the good of others.  My three brothers and I were children when our mother passed away and Jairo as a teenager already worked and provided food and our studies for us.  I thank God for Jairo. He is a friendly, repetitive, sincere, responsible and honest man who leaves marks on hearts with his generosity.[14]

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5765853/.
[12] Ilanit Tal Young, *et al.*, *Suicide Bereavement and Complicated Grief*, Dialogues in Clinical Neuroscience, (June 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3384446/pdf/DialoguesClinNeurosci-14-177.pdf.
[13] *See* Exhibit 3 – Mr. Rodriguez-Martinez's Letter to the Judge.
[14] *See* Exhibit 4 – Letters of Support at 7.

His generosity and empathy for others is admired not only by his family and friends but also the

community at large.  His friend, Juan Carlos Gamez, recalls that Mr. Rodriguez-Martinez:

> [I]s a person who wins everyone's affection because of the way he treats everyone.  Jairo is loved by everyone that he has cared for.  In the beginning Jairo always dreamed of helping the elderly who no longer can help themselves.  Jairo would work to buy them food, and helping them with whatever and he has fulfilled that dream.  He is a good friend, who does not think twice before helping his friends or family.[15]

When it comes to taking care of his family and friends in Honduras, there are no boundaries to how

far Mr. Rodriguez-Martinez would go.  Although he is not proud of his decisions and takes full

responsibility for his actions in this case, as he tells the Court, he did what he had to do for his family:

> I never wanted to return to the United States but because both my parents became very ill, I felt scared that my parents would die if I did not find a way to make more money to pay for their medical costs.  I would give my life for them, and as the oldest child I felt it was my duty to find a way to take care of them.  But I know it was still wrong and I should not have broken the law.  I promise Judge I will never do this again, no matter the situation back at home in Honduras.[16]

 He now understands that despite his best intentions, his actions were foolish and damaging to those

around him.  Through this case, for the first time in his life, Mr. Rodriguez-Martinez has been

completely honest with his parents about how he made money in the United States.  His decision to be

honest with his parents was a critical step to ensure that he will never be tempted to return to the

United States when faced with hardship.  His family has made it clear to him that no amount of money

is worth losing him.

Furthermore, Mr. Rodriguez-Martinez's incarceration has affected so many of his loved ones

who are dependent on him.  His son, Antoni, who was born with a heart murmur can no longer afford

his heart medications or attend his doctor appointments.  Mr. Rodriguez-Martinez has been the sole

provider for Antoni since he was 2 years old after his birth mother abandoned him.  His other son,

Joshua, 7 years old, dropped out of school this year because he did not have enough money to put

towards his education.  He is also dearly missed by his 4-year old daughter, Kimberly, and his wife,

Leydis Yaneth Cruz, who has been working and raising their daughter on her own.

The health of his parents has been slowly deteriorating since he was taken into custody in

---

[15] *See* Exhibit 4 – Letters of Support at 22.
[16] *See* Exhibit 3.

9

December of 2019.  His mother, who was diagnosed with "arterial hypertension, Type 2 diabetes mellitus and mild mitral valve failure", has been unable to pay for her medication.[17]  She explains, "[m]y son was the one who was in charge of providing me with food, and my medications (to control the diabetes condition with which I fight day by day)."[18]  Mr. Rodriguez-Martinez's father, who is still recovering from the injuries he sustained from a serious motorcycle accident "feel[s] awful that my son went to the United States to help pay for my medical costs and take care of me and my wife. He is a good son and has always had a big heart."[19]  His father is now paralyzed from the waist down after "suffering a spinal compression at the level of the cervical spine due to a C4, C5 fracture."[20]

From the beginning of this case, Mr. Rodriguez-Martinez accepted the fact that his actions carry severe consequences.  He is, however, looking forward to the opportunity to return home to Honduras with Leydis and his daughter Kelly to take care of his parents and be a father to his three children.  He is sincere when he tells the Court:

> I will never sell drugs again or enter the United States illegally again.  I cannot risk breaking my parents' heart and them getting more sick or dying while I am not by their side. I also cannot risk hurting my wife and leaving her alone to take care of our daughter. They have all stayed strong for me and I know they will make sure I never break the law again.  And I swear on my life that I will never do this again.  I have learned a lesson I will never forget.[21]

His family is also aware of the risks involved if he were to ever return to the United States and will make sure that Mr. Rodriguez-Martinez will never break the law again.  His mother tells the Court, "I know he will not go back to America.  I know he will not break the law again.  He is so very sorry for what he did.  I already lost one son and cannot lose another son."[22]

### b. Nature and Circumstances of the Offense

While Mr. Rodriguez-Martinez's offense conduct was undeniably serious, he confessed to his crime immediately upon his arrest and accepted responsibility at the early stages of this case.  He has been forthcoming and cooperative with the government since the beginning of his case.

---

[17] *See* Exhibit 2.
[18] *See* Exhibit 4 at 20.
[19] *See* Exhibit 4 at 9.
[20] *See* Exhibit 1.
[21] *See* Exhibit 3.
[22] *See* Exhibit 4 at 20.

Furthermore, while Mr. Rodriguez-Martinez recognizes that his decision to get involved in distributing drugs is serious and inexcusable, the tragic events that led to his current offense are significant mitigating factors that warrant a downward variance.

After his brother's suicide, Mr. Rodriguez-Martinez vowed that he would never return to the United States or get involved in selling drugs.  He was traumatized by how his brother's lifestyle had led to a five-year prison sentence and death.  Mr. Rodriguez-Martinez could see that he was on the same path as his brother and wanted to ensure a different future for himself.  Sadly, his father was in a motorcycle accident and sustained severe injuries to his spine and brain.  To make matters worse, he learned that due to the complex nature of his father's surgery and treatment, all the local hospitals and physicians refused to admit him as a patient.  His only option to save his father was turn to a private hospital that required payment before treatment.

Mr. Rodriguez-Martinez knew did not have enough money to pay for his father's medical bills, especially in addition to providing for his two children and his elderly mother who also required heart and blood pressure medication.  He knew that it was nearly impossible for him to make enough money in Honduras to pay for his father's surgery while putting food on the table for his children.  So, he broke the promise he had made to himself and sought the assistance of a coyote to get across the border in hopes of securing a construction job in Florida through his cousin.

But, Mr. Rodriguez-Martinez never made it to Florida.  Due to his inability to fully pay the coyote, he was taken hostage for nearly a month and only released under the condition that he pay off his debt to by selling drugs on the street.  He agreed and his actions have led him before this Court.

While Mr. Rodriguez-Martinez was arrested with a large quantity of drugs, he was a non-violent street dealer who did not control pricing of the drugs nor did he control the supply of drugs. His role was mainly to act as a delivery person or broker in hopes of paying off his debt and safely returning to his family in Honduras.  Any money he could save up was sent home to his family in Honduras to pay for his father's surgery.

### c.  The Need for Adequate Deterrence and Just Punishment

Finally, the need for deterrence and adequate punishment is met with a sentence of 10 months incarceration in this case.  U.S. Probation does not recommend a downward variance on the basis that

his prior imprisonment of six months did not deter him from engaging in new criminal conduct.

While Mr. Rodriguez-Martinez acknowledges Probation's concerns, it is important to note that the

circumstances surrounding his life have drastically changed since his last incarceration in 2016.  Mr.

Rodriguez-Martinez has undergone multiple traumatic experiences where he believed he could die at

any moment, including being taken hostage for nearly a month by "coyotes" and being detained at

Santa Rita Jail during a life-threatening pandemic.  While his actions of illegally entering the United

States and selling drugs are not excusable, these harrowing experiences are something that he would

never risk his life to do again.  This is especially true since his family members are now all aware that

Mr. Rodriguez-Martinez was risking his safety and liberty by selling drugs in America to help the

family.  While grateful, the family will never let this happen again.  Thus, the 10 months Mr.

Rodriguez-Martinez has served at Santa Rita Jail during the COVID1-9 pandemic meets the need for

adequate deterrence in this case.

Indeed, the punishment Mr. Rodriguez-Martinez received thus far is much greater than the 10

months of actual time served due to his detention at Santa Rita Jail during the COVID-19 pandemic.

He has been quarantined for suspected or actual COVID-19 exposure on three separate occasions, the

first time in February, the second time in April, and the third time in July when he tested positive for

COVID-19.[23]  Chung Decl. ¶¶ 6-7.

Mr. Rodriguez-Martinez reports that following his positive test for COVID-19 on July 15,

2020, he was locked up with no medical equipment or special accommodations such as extra blankets

or clothing.[24]  He was visited twice a day for a quick temperature and oxygen check and only given

Motrin to manage his severe headaches and body aches.  He describes his symptoms as headaches

that felt like his head would explode, aching that he could feel in his bones, pain and irritation of the

eyes, chills, loss of appetite, exhaustion to the point he could not get out of bed to eat, and diarrhea.

Chung Decl. ¶ 8.  The pain, fear, and isolation triggered horrific memories of his brother's suicide

---

[23] *See* Exhibit 5 – Quarantine Medical Records.
[24] *See* Exhibit 6 – Medical Records Showing COVID-19 Positive and Symptoms. Mr. Rodriguez-Martinez's experience is consistent with the Santa Rita Jail Outbreak Control Plan which includes isolation cells, sick calls twice a day at the cell door, and no follow-up COVID-91 test for those with mild symptoms or who are asymptomatic. *See* Santa Rita Jail COVID-19 Outbreak Control Plan at 4-8, dated Aug. 25, 2020 (available at http://alamedacountysheriff.org/files/COVIDPlan08182020.pdf).

and the time he was taken hostage the "coyotes". *Id*. On those particularly difficult days, he often cried himself to sleep, uncertain about whether he would ever see his family again. It is unsurprising that he is currently receiving melatonin to manage his severe insomnia.[25]

Strangely, none of these symptoms were recorded in the medical logs and instead his condition is listed as "asymptomatic".[26] For example, on July 19, 2020 at 10:01 p.m. there is an entry that describes Mr. Rodriguez-Martinez as "Pt. asymptomatic".[27] However, there is evidence that Mr. Rodriguez-Martinez submitted a Medical Request Form on July 29, 2020 stating, "I NEED PAINKILLERS, I Have a lot of HEADegs. I also need aloevera – cream For mustle pain."[28] Despite the spelling errors, it is clear that he was suffering from severe headaches and body aches. The next day, he submitted another Medical Request Form requesting "I need ointment for my muscle pain".[29]

When the quarantine was lifted, Mr. Rodriguez-Martinez was not given another COVID-19 test to verify he was no longer infected.[30] Even when he explicitly requested to be tested again, the jail denied his request. He now worries that his health has been forever compromised, and he may not be able to provide for his three children and elderly parents.[31] The psychological trauma from repeated exposure to the virus at Santa Rita Jail and fear that it is ever so close, and then actually contracting the virus with unknown long-term health consequences is significant punishment, far exceeding the 10 months of time served.

The 10 months he has served in Santa Rita Jail should be counted as much more than 10 months due to the extreme distress he endured from repeated quarantines for COVID-19 and then contracting the virus while incarcerated. During the pandemic, Mr. Rodriguez-Martinez has faced more than the theoretical exposure to a life-threatening virus. He was quarantined two times due to

---

[25] *See* Exhibit 7 – Medical Records relating to insomnia.
[26] *See* Exhibit 5.
[27] *See* Exhibit 5 at pg. 5.
[28] Exhibit 6 at pg. 5.
[29] *Id*. He wrote in Spanish, "occpo pomada para el dolor de musculo."
[30] *Id*.
[31] *See* World Health Organization, *What We Know About Long-Term Effects of COVID-19*, (September 9, 2020) https://www.who.int/docs/default-source/coronaviruse/risk-comms-updates/update-36-long-term-symptoms.pdf?sfvrsn=5d3789a6_2 (Some patients develop medical complications due to contracting COVID-19 that may have lasting health effects. In fact, there are many case reports from people who do not regain their previous health following COVID-19).

1   exposure to his housing unit and again when he tested positive for COVID-19.  This repeated

2   psychological stress and actual infection with a dangerous virus with unknown long-term health

3   consequences – all the while entrusted to the care and custody of the government – is certainly worth

4   double, triple, or quadruple time.  For purpose of considering sentencing under § 3553(a), the Court

5   could reasonably view his time served as equivalent to 20, 30, or 40 months under normal conditions.

6          Furthermore, it would be impossible to discuss sentencing considerations without addressing

7   the ongoing COVID-19 pandemic and it impact on the federal prison system.  A sentence of

8   incarceration is, today, a far harsher punishment than the Sentencing Commission envisioned in

9   promulgating the guidelines, and Mr. Rodriguez-Martinez respectfully submits that the Court should

10  consider the dire, extant conditions in the majority of federal facilities across the nation in fashioning

11  a just punishment.[32]  Indeed, Honorable Judge Jon S. Tigar recently stated in a sentencing hearing:

12          there's no question in my mind that there has been an adjustment, that sentencing
13          somebody to a year in prison now, or a number of years in prison now, has become a
            more significant punishment than it was just a year ago, because you're sentencing
14          somebody to do their time in prison while we have COVID.[33]

15  The number of incarcerated individuals who have tested positive for COVID-19 surpassed

16  50,000 in June 2020, and continues to increase rapidly nationwide, belying the efficacy of the

17  measures taken thus far by the BOP to stem the outbreak.[34]  The rate of infection among inmates is

18  now over five times higher than the general population.[35]  Though these statistics appear grim, the

19  truth is far worse: various new sources have uncovered the BOP's underreporting of new infections,

20  positive tests, and deaths.[36]

---

21

22  [32] *See* Fed. Bureau of Prisons, *BOP: COVID-19 Update*, http://www.bop.gov.coronavirus/
    [33] *See* Exhibit 8 – Transcript of Sentencing before Honorable Judge Tigar on June 19, 2020.
23  [34] *See* Andrew Welsh-Huggins, U.S. Prison Inmate Coronavirus Soar Past 50,000, Time (July 3,
    2020), http://time.com/5862790/prison-inmate-coronavirus-outbreaks/; *see also* Keri Blakinger, "*I
24  Begged Them To Let Me Die*": *How Federal Prisons Became Coronavirus Death Traps*, The
    Marshall Project (June 18, 2020),
25  https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-
    became-coronavirus-death-traps.
26  [35] Brendan Saloner, et al., *COVID-19 Cases and Deaths in Federal and State Prisons*, American
    Medical Association, (July 8, 2020),
27  https://jamanetwork.com/journals/jama/fullarticle/2768249.
    [36] *See* Keri Blakinger, *"I Begged Them To Let Me Die"*: *How Federal Prisons Became Coronavirus
28  Death Traps*, The Marshall Project (June 18, 2020),
    https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-
    became-coronavirus-death-traps; Taylor Miller Thomas, *How U.S. Prisons Became Ground Zero for*

1      More troubling still – and despite the well-documented importance of hygiene in the battle

2   against COVID-19 – members of newly admitted and general populations alike have complained of a

3   lack of disinfectant supplies, including soap, and a shortage of personal protective equipment, such as

4   proper face coverings and gloves.[37]  Some inmate reports reflect shockingly horrid conditions, such

5   as being forced to reuse masks stained with blood and vomit.[38]

6      Beyond basic sanitation issues, it is now clear that the increased rate of COVID-19 cases in

7   federal facilities partially results from the continuous reintroduction of newly admitted individuals

8   into the prison system.[39]  While the BOP claims to have suspended mass movement of incarcerated

9   individuals, federal facilities still report large transfers of individuals between facilities across the

10  nation.  Smaller federal facilities admit to an inability to fully maintain quarantine protocol for all

11  new admissions.[40]

12     Clearly losing the battle against COVID-19, federal facilities have resorted to extreme

13  measures, such as utilizing solitary confinement for extended periods of time to quell outbreaks.[41]

14  Consequently, solitary confinement, once employed as a punishment for violent or dangerous

15  inmates, has become a commonplace strategy for disease containment.  Rehabilitative programming,

16  once widely available, has been canceled altogether, social visits have been eliminated, and inmates'

---

*Covid-19*, Politico (June 25, 2020),
https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022; Christopher Zoukis, *Silence: The Bureau of Prisons' Pathetic Response to the COVID-10 Pandemic*, Prison Legal News (June 1, 2020),
https://www.prisonlegalnews.org/news/2020/jun/1/silence-bureau-prisons-pathetic-response-covid-19-pandemic/
[37] *See* Blakinger, *supra*.
[38] *See* Colleen O'Dea, COVID-19 Horror Stories Prompt ACLU-NJ to File for Temporary Release of Medically Fragile Prisoners, NJ Spotlight (May 6, 2020),
https://www.njspotlight.com/2020/05/covid-19-horror-stories-prompt-aclu-nj-to-file-for-temporary-release-of-medically-fragile-prisoners/.
[39] *See* Fed. Bureau of Prisons, *BOP Implementing Modified Operations*,
https://www.bop.gov/coronavirus/covid19_status.jsp
[40] *See* Walter Pavlo, *Otisville Federal Prison Camp Is More Like A Higher Security Prison In Fight Against Covid-19*, Forbes (June 28, 2020),
https://www.forbes.com/sites/walterpavlo/2020/06/28/otisville-federal-prison-camp-is-more-like-a-higher-security-prison-in-fight-against-covid-19/#1b6abaefbbe4.
[41] *See* Joseph Shapiro, *As COVID-19 Spreads In Prisons, Lockdowns Spark Fear of More Solitary Confinemen*t, (June 15, 2020), NPR,
https://www.npr.org/2020/06/15/877457603/as-covid-spreads-in-u-s-prisons-lockdowns-spark-fear-of-more-solitary-confinemen.

1    movements have been restricted severely.[42]  This is particularly terrifying for Mr. Rodriguez-

2    Martinez and his parents because Wilson's inability to recover from the trauma of being held in

3    solitary confinement for nearly a year led him to take his own life.

4         In addition, if Mr. Rodriguez-Martinez is sentenced to years in prison, he will surely be

5    transported to a private prison in contract with the BOP generally reserved for those who will be

6    deported upon completion of their term of incarceration, and will be subjected to extreme conditions

7    of confinement, by any measure.[43]  Inmates being held in private prisons are subject to extremely

8    disturbing conditions, including overcrowding, little to no medical care, and unexperienced and low-

9    trained staff.[44]  During President Trump's administration alone, "a record number of immigrants have

10   died in detention"[45] at these private prisons.  Even more disturbing, unlike the BOP facilities, these

11   private contract prisons do not even publish their COVID-19 related statistics for public viewing.[46]

12   Mr. Rodriguez-Martinez will likely face a high risk of infection with a deadly virus, and will have

13   inadequate means to protect himself; he will be entirely isolated from his wife and daughter here in

14   the Bay Area; he may be subjected to solitary confinement, through no fault of his own; and, he will

15   likely have little or no access to rehabilitative services.

16        Mr. Rodriguez-Martinez respectfully submits that the Court must consider these realities when

17   ascertaining the length of a just sentence in this case.  The punishment for a crime, especially for a

18   non-violent offender, should not be psychological trauma and a disease with unknown life-long

19

20   [42] *See* Fed. Bureau of Prisons, *BOP Implementing Modified Operations, supra*; *see also* Walter Pavlo,
21   *Otisville Federal Prison Camp Is More Like A Higher Security Prison In Fight Against Covid-19*,
     Forbes (June 28, 2020),
22   https://www.forbes.com/sites/walterpavlo/2020/06/28/otisville-federal-prison-camp-is-more-like-a-higher-security-prison-in-fight-against-covid-19/#1b6abaefbbe4.
     [43] Clyde Haberman, *For Private Prisons, Detaining Immigrants Is Big Business*, The New York
23   Times, https://www.nytimes.com/2018/10/01/us/prisons-immigration-detention.html (October 1,
     2018); Nic Querolo, *What To Know About Private Prisons Amid the U.S. Border Crisis*, Bloomberg,
24   https://www.bloomberg.com/news/articles/2019-07-17/how-border-crisis-brings-scrutiny-to-private-prisons-quicktake (July 16, 2019).
25   [44] *See* Seth Freed Wessler, *Investigation Into Private Prisons Reveals Crowding, Under-Staffing And
     Inmate Deaths*, (August 25, 2016), NPR, https://www.npr.org/2016/08/25/491340335/investigation-
26   into-private-prisons-reveals-crowding-under-staffing-and-inmate-de.
     [45] Hauwa Ahmed, *How Private Prisons Are Profiting Under the Trump Administration*,
27   https://www.americanprogress.org/issues/democracy/reports/2019/08/30/473966/private-prisons-profiting-trump-administration/ (August 30, 2019).
28   [46] *See* Federal Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/ ("The inmate totals
     listed do not include inmates . . . being held in privately managed prisons.").

1  health consequences.  Yet that is the sentence that has been imposed on Mr. Rodriguez-Martinez in

2  this case.  It is respectfully submitted that this Court grant a downward variance and sentence Mr.

3  Rodriguez-Martinez to time served.

4  **VI.      CONCLUSION**

5        For the foregoing reasons, Mr. Rodriguez-Martinez respectfully requests that the Court grant

6  his motion for a downward variance to a sentence of time served (10 months), followed by a term of

7  supervised release.

8
   DATED:  October 12, 2020                        Respectfully Submitted,
9

10                                                 _/s/_____

11                                                 NAOMI CHUNG
                                                   Attorney for Jairo Noel Rodriguez-Martinez
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28